UNITED STATED BANKRUPTCY COURT
FOR THE DISTRICT OF COLORADO
Honorable Howard R. Tallman

| | | |
|---|---|---|
| **In re:** | ) | |
| | ) | |
| **ANTHONY LOUIS STELLATO and** | ) | **Case No. 12-12935 HRT** |
| **LISA DAWN STELLATO,** | ) | **Chapter 13** |
| | ) | |
| **Debtors.** | ) | |
| | ) | |
| | ) | **Adversary No. 12-01207 HRT** |
| **ANTHONY LOUIS STELLATO,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | |
| **DEN-CUT FINANCIAL, LLC,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

**ORDER ON COMPLAINT FOR VIOLATION OF AUTOMATIC STAY**

THIS MATTER came before the Court on the Plaintiff's Complaint for Willful Violation of the Automatic Stay Pursuant to 11 U.S.C. § 362 (docket #1) filed on April 10, 2012, and the Defendant's Answer (docket #4) filed on May 15, 2012. A trial was held on October 21, 2013, after which the Court took the matter under advisement. After reviewing the entire record in the case, the Court is now ready to rule.

I.  Background

On January 31, 2011, Plaintiff ("Stellato") and his corporation, Stellato's Grocery and Deli, Inc. (the "Company") signed a Promissory Note and Commercial Security Agreement in favor of Defendant ("Den-Cut") in the amount of $58,021 in order to finance the purchase of restaurant equipment. Stellato tendered monthly payments to Den-Cut until September 2011, at which time Den-Cut agreed to a temporary deferment of payments. In December 2011, however, Den-Cut began threatening to repossess the equipment if payment was not made. Stellato made two payments, but they did not cover the total amount of the arrearage, which Den-Cut then demanded be paid in full.

On approximately February 6, 2012, four employees of Den-Cut, including Gary Neumann ("Neumann"),[1] appeared at the Company's premises with a UCC-1 financing statement and announced they were there to take the equipment due to nonpayment. Stellato called the police, and locked the Den-Cut employees inside while waiting for the police to arrive. Neumann and the others began unplugging refrigerated units, taking out the food and putting it on shelves. When the police arrived, they asked Neumann to see his paperwork. Because he did not have an order for possession or a writ of assistance, the police told him to leave, which he did, accompanied by the other Den-Cut employees. Stellato incurred some damage due to this repossession attempt, including melted dairy products and damage to a back door handle. He did not seek damages in this Court for the February 6 event, however, as it occurred pre-petition.

According to Neumann, he went back to Den-Cut and explained to Den-Cut's Manager, Charles Rudibaugh, that they were unable to get the equipment. Den-Cut then filed a replevin action in the Adams County, Colorado District Court (the "State Court"), seeking to recover the equipment. The verified complaint of replevin, filed on February 6, named both the Company and Stellato as defendants, and listed the amount owing as $36,174.67. The State Court entered an Order for Possession on February 21, 2012. Both Stellato and Neumann testified that at some point on February 22, 2012, Neumann again appeared at the Company premises with several others, but did not enter the building. Stellato called the police, who arrived and advised Neumann that he again did not have the correct paperwork because he was missing a writ of assistance. A writ of assistance was obtained later that day.

Stellato and his wife filed their Chapter 13 bankruptcy petition on February 22, 2012. They listed the equipment on their Schedule B, as personal property owned by Stellato, and listed Den-Cut as a creditor on Schedule D. Stellato's counsel notified Den-Cut of the bankruptcy in several ways. First, he faxed a notice of automatic stay to Den-Cut's then counsel, Mr. Bowes, at 3:41 p.m. on February 22, 2012. (Exhibit 7). On February 23, 2012, he filed a suggestion of bankruptcy in the State Court action (Exhibit 10), and sent a letter to Mr. Bowes, by email and fax, at 2:30 p.m., asserting that the automatic stay applied against any replevin attempt. (Exhibit 8). Stellato's counsel attached the proposed Chapter 13 plan to the email and fax. Bowes responded by email on February 24, 2012, at 9:10 a.m. (Exhibit 9). Bowes acknowledged receipt of the letter, stated he had reviewed the proposed plan, and did not agree with the valuation of the equipment.[2] Nothing was said about the stay or the replevin action in Bowes' email.

Neumann testified that on or after February 22, 2012, but before February 24, 2012, Rudibaugh told him that there was a bankruptcy filed in the "Stellato case." Neumann expressed

---

[1] Neumann, who testified at trial, was employed by Den-Cut from approximately November 2011 to July 2012.

[2] The Chapter 13 Plan was confirmed on November 1, 2012. The Plan provides for payments to be made to Den-Cut towards the balance due on the equipment.

his opinion that if there was a bankruptcy, they were stayed. Neumann testified that Rudibaugh told him, "F*** the stay, I want my equipment. If you can't handle that go work someplace else. You work for me." Rudibaugh testified that he did not recall this conversation.

On the morning[3] of February 24, 2012, Neumann and nine other representatives of Den-Cut, including Rudibaugh, appeared on the Company's premises with three trucks to execute the Order for Possession. They met up with a Deputy Sheriff in the parking lot at some point before attempting to enter the premises. Stellato testified that he became fearful when he saw ten men coming towards the premises carrying items such as a tie rod and wrenches, so he locked the doors and left the premises. Stellato further testified that he only saw the Deputy enter the parking lot as he was leaving, and did not understand at that time that the Deputy had anything to do with the repossession, since police were often in the area picking up dry cleaning.

The Deputy testified that as he arrived, he saw a person running out the back door of the premises, but he was not sure if it was Stellato. He approached the building and attempted entry through the front double door, but found it was "secured."[4] The back door also was locked, so the decision was made to obtain entry through the drive-through window. Den-Cut representatives then cut through the drive-through window and entered the premises. Under the supervision of the Deputy, Den-Cut representatives began to remove food items from the equipment, unplug or unhook the equipment, and load it onto the trucks. After approximately an hour, Stellato returned to the premises with evidence of the bankruptcy filing. The Deputy called the State Court and spoke to a clerk, who confirmed the notice of bankruptcy filing. The Deputy then ordered the Den-Cut crew to stop removing the items, return the items that had been removed, and leave the premises. The Deputy testified that, while he saw food being placed on the floor, he did not see anyone throwing food. He also testified that he was unaware of the bankruptcy until Stellato came back with the papers.

Stellato testified that when he returned with the papers, all the food had been put on the floor, or in the trash, even though shelving was available, and some food looked like it had been thrown. Appliances were in the middle of the room and he had to put them back. Electricity and water had been shut off. He also observed damage to the brackets on appliances, damage to walls where appliances had been pulled off, and also an electrical cord cut on slicers. His wife came to the premises and took pictures, which were admitted into evidence.

---

[3] Stellato testified that the Den-Cut representatives arrived sometime between 8:00 a.m. and 10:00 a.m. Neumann testified that he and others began getting ready to go to the premises at about 6:30 a.m. or 7:00 a.m.

[4] It was unclear from the Deputy's testimony whether he had tried unsuccessfully to forcibly open the front door. Rudibaugh testified that after the Deputy "waived them over" to the premises, they tried to cut the lock on the front door, but because there were "too many pins," the Deputy told them to cut open the drive-through window instead.

At trial, Rudibaugh testified that he did not see food being thrown or put in the trash. He confirmed that the Deputy appeared in one of the photos that showed food on the floor, piled haphazardly, with some of the food spilled (Exhibit 6, photo 37). He stated that brackets on appliances could have been bent previously by pulling out the appliances for cleaning. He also testified that appliances were simply unplugged and that no cords were cut. Neumann testified that he was unsure how the food was treated because he was outside checking serial numbers by the trucks. Neumann testified that the gas line was disconnected and the water line was turned off. Stellato testified that it took him two full business days to salvage what he could of the food product, clean the premises, and move and reconnect the appliances.

By the time the parties filed their pre-trial statement on October 1, 2013, the parties agreed that Den-Cut had violated the automatic stay, and the only matter to be decided at trial was the amount of damages. However, on October 9, 2013, Den-Cut filed a motion in limine pursuant to Fed. R. Civ. P. 37(c) and Fed. R. Bankr. P. 7037, to exclude all evidence at trial that was not previously disclosed in Stellato's initial disclosures and subsequent supplemental disclosures. Den-Cut argued that none of Stellato's disclosures contained a computation of damages, as required by Fed. R. Civ. P. 26(a) and Fed. R. Bankr. P. 7026. Before trial, the Court ruled that it would keep the motion in limine under advisement and receive evidence on damages, subject to objections by Den-Cut.

II. Discussion

A. Motion in limine

Federal Rule of Civil Procedure 37(c)(1) provides that a party failing to provide information required by Rule 26(a) "is not allowed to use that information . . . to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." *Hoffman v. Construction Protective Serv., Inc.*, 541 F.3d 1175, 1179 (9th Cir. 2008). Federal Rule of Civil Procedure 26(a)(1) provides:

[A] party must, without awaiting a discovery request, provide to the other parties:

 (iii) a computation of each category of damages claimed by the disclosing party--who must also make available for inspection and copying as under Rule 34 the documents or other evidentiary material, unless privileged or protected from disclosure, on which each computation is based, including materials bearing on the nature and extent of injuries suffered.

In the Motion, Den-Cut alleges that Stellato has never provided a computation of damages or identified documents upon which a computation may be based. Den-Cut further notes that as late as October 1, 2013, with the filing of the pre-trial statement, counsel for Stellato stated that damages were "incapable of being calculated." Den-Cut asks for the exclusion of all evidence not previously disclosed in Stellato's initial or supplemental disclosures, as well as "any testimony pertaining to a calculation of [Stellato's] damages."

Stellato responds that early in the case, on May 31, 2012, Den-Cut was served with Stellato's initial disclosure statement, which listed 31 photographs of damage resulting from Den-Cut's repossession attempt. Approximately a year later, Den-Cut was served with Stellato's witness and exhibit list, which contained the same list of photos. At trial, upon questioning by the Court, Den-Cut's counsel conceded that Den-Cut had been provided with copies of the photos some time ago. Nevertheless, Den-Cut's counsel still objected because Stellato had never provided a computation of damages, or receipts, invoices, or other evidence from which a computation of damages could be made.

Den-Cut conducted no discovery in this case and never filed a motion to compel.[5] At trial, Stellato testified that he incurred actual damages in the amount of $5,261 due to food spoilage. He also testified that he had received estimates to repair damage to the front door and drive- through window, in the amount of $3,360 for the door and $2,150 for the window, plus tax of $470.90, resulting in a total actual damages amount of $11,271.90. He testified he has not been able to afford to fix either the door or window.

"The determination of whether a Rule 26(a) violation is justified or harmless is entrusted to the broad discretion of the district court." *Woodworker's Supply, Inc. v. Principal Mut. Life Ins. Co.*, 170 F.3d 985, 993 (10th Cir. 1999). "[T]he following factors should guide its discretion: (1) the prejudice or surprise to the party against whom the testimony is offered; (2) the ability of the party to cure the prejudice; (3) the extent to which introducing such testimony would disrupt the trial; and (4) the moving party's bad faith or willfulness. *Id. (citations omitted)*.

Violations of Rule 26 may warrant evidence preclusion. *See, e.g.*, *Yeti by Molly Ltd. v. Deckers Outdoor Corp.*, 259 F.3d 1101, 1107 (9th Cir. 2001). Yet evidence preclusion can be a harsh sanction. *R&R Sales, Inc. v. Insurance Co. of Pennsylvania*, 673 F.3d 1240, 1247 (9th Cir. 2012). The Court must exercise its discretion to determine what is warranted in a particular case, and need not make explicit findings concerning the existence of a substantial justification or the harmlessness of a failure to disclose. *Woodworker's Supply* at 993.

The Court notes that Stellato's complaint requests: "damages in an amount sufficient to compensate for his actual damages to the store, damage to the reputation of the store, and for damages incurred due to lost revenue, credit, economic, and non-economic damages," as well as punitive damages, attorney's fees and costs, and compensation for intentional or negligent infliction of emotional distress. The Court will analyze the evidence presented in each category of damages to determine whether exclusion is warranted.

The Court finds that actual damages were obvious from the 31 photographs that Den-Cut conceded they had for some time in advance of trial. While invoices and receipts were not

---

[5] Den-Cut obtained new counsel late in the case, and did make a motion to re-open discovery, which this Court denied, given that the case had been pending for 18 months and trial already had been postponed once.

produced, Stellato credibly testified as to his calculations of the total amount of damage for food spoilage, such as the cost to replace large amounts of deli meat and dairy items. Such testimony would not likely have been contested even if a damage calculation had been provided, making the lack of a damage calculation harmless. This case is unlike *Armenian Assembly of Am., Inc. v. Cafesjian*, 746 F.Supp. 2d 55 (D.D.C. 2010), cited by Den-Cut, where millions of dollars in damages were being contested. Actual damages in this case are in a small amount and can easily be determined. Thus, the Court will overrule Den-Cut's objections as to evidence of actual damages for food spoilage. With regard to evidence of actual damages for repair of the door and window, the Court finds that Stellato credibly testified as to the amounts estimated for the repair, obtained shortly before trial. Because Stellato had not been able to afford the repairs, his failure to provide estimates earlier in the case is both justified and harmless. Thus, the Court overrules Den-Cut's objections as to evidence of actual damages for repair of the door and window.

The Court also agrees with Stellato that punitive damages are generally incapable of being calculated in advance of trial, and thus also overrules Den-Cut's objection to evidence pertaining to punitive damages. However, damages for "emotional distress, lost revenue, credit, and non-economic damages," to the extent they were actually sought,[6] should have been estimated and disclosed prior to trial. At trial, Den-Cut objected to testimony by Mr. and Mrs. Stellato concerning their stress and emotional upheaval allegedly caused by Den-Cut's repossession efforts. Den-Cut made a standing objection to this testimony, citing Stellato's failure to provide any calculation of damages in these categories. Even if a calculation had been presented, however, the Court notes that generally, "fleeting and unsubstantiated emotional distress is not compensable." *In re Gagliardi*, 290 B.R. 808, 819 (Bankr. D. Colo. 2003). Stellato presented no evidence of medical injury and did not otherwise attempt to quantify the injury, either before or during trial. Thus, the Court will sustain Den-Cut's objection as to evidence of emotional distress. Similarly, Stellato did not attempt to quantify any damages in terms of "lost revenue, credit, or non-economic damages," so the Court will sustain Den-Cut's objection to any testimony or evidence as to those categories of damages.

With regard to costs and attorney fees, the Court notes that these are considered actual damages by the plain language of § 362(k) ("an individual injured by any willful violation of a stay . . . shall recover actual damages, including costs and attorneys' fees . . . ."). In the Motion, Den-Cut argues that the Court should not "guess at those fees" when they could easily have been documented. The Court finds that, even though attorney fees could have been calculated and disclosed prior to trial, the fact that they were not does not prejudice Den-Cut. The Court only allows attorney fees and costs that are reasonable, and will require Stellato to provide a bill of fees and costs, with an opportunity for Den-Cut to object, before making an award in this damages category.

---

[6] While these categories of damages were listed in the complaint, Stellato did not present evidence of damages in these categories, other than by way of testimony as to emotional distress.

B. Violation of the Automatic Stay

Turning to the merits of the case, in the pretrial statement, Den-Cut admits that it violated the automatic stay under 11 U.S.C. §362(a).[7] In closing argument, Den-Cut's counsel further admitted to a willful[8] violation of the automatic stay. Once a court finds a violation of the stay to be willful, Section 362(k) makes the award of damages for injury mandatory. *In re Gazzo*, 505 B.R. 28, 45 (Bankr. D. Colo. 2014). Thus, the only issue remaining for the Court is the amount of damages.

1. Actual damages

As previously noted, Stellato testified credibly that the amount of damages he incurred due to food spoilage was $5,261. He testified, and the evidence showed, that Den-Cut left food items all over the floor, spilling and ruining some items. At trial, Rudibaugh testified that Den-Cut representatives put the food on the floor "because there was no place else to put it." Photographs admitted into evidence, however, show that shelving space was available. Further, the photographs in evidence showed food items placed next to a toilet (Exhibit 6, photo 22); spilled vegetables leaking on a box of food (Exhibit 6, photo 30); water on the floor due to a ripped out ice machine (Exhibit 6, photo 31); a box of raw meat placed on top of a box of cookies (Exhibit 6, photo 39); and a mousetrap placed alongside food items (Exhibit 6, photo 40). Stellato testified that he saved what product he could, within food safety guidelines, and is not asking for damages for items he salvaged.

It was disputed whether items had actually been thrown or merely piled haphazardly. Rudibaugh tried to explain the haste of the repossession effort by stating he was just following the orders of the Deputy, who encouraged him to complete the repossession as quickly as possible. The Deputy did testify that he normally does encourage repossession agents to act quickly. He also testified that, once Stellato returned to the premises with notice of the bankruptcy stay, he told the Den-Cut representatives to leave the premises. While the Deputy's actions may have caused Den-Cut to act hurriedly, once Den-Cut was ordered to stop the repossession it had a duty to rectify the damage, if not immediately, then at some point thereafter. *See In re Kline*, 472 B.R. 98, 103 (10th Cir. BAP 2012) ( a party who violates the automatic stay has a duty to remedy that violation). Den-Cut made no effort do so, and instead

---

[7] This Court found that the automatic stay applied in its order entered in the main bankruptcy case on May 10, 2012.

[8] The term "willful" refers to the deliberateness of the conduct, coupled with knowledge of the filing. It does not require an intent to violate a court order. *In re Johnson*, 501 F.3d 1163, 1172 (10th Cir. 2007). A good faith belief of a right to the property is irrelevant. *Id.*

has chosen to litigate their admitted stay violation.[9] The Court will thus award actual damages for food spoilage in the amount of $5,261.

Regarding the actual damage to the door and drive-through, Den-Cut argues that this damage would not have occurred had Stellato not locked the door and fled the premises when he saw Den-Cut representatives arrive. The Court finds this argument without merit. First, Stellato credibly testified that he was fearful, considering the past repossession attempts Den-Cut had made, and the increased number of people sent to the premises. He also credibly testified that he did not connect the Deputy with the repossession attempt. Finally, the Court notes that if Den-Cut had not willfully violated the stay, there would have been no need for Stellato to lock the doors and flee in the first place. The Court will thus award damages for the door and drive-through window in the amount of $6,010.90.

2. Attorney fees and costs

The Court will allow reasonable attorney fees and costs as actual damages as mandated by § 362(k), upon a proper application to the Court. The Court agrees with Den-Cut that reasonable attorney fees and costs do not include Stellato's filing of a motion for summary judgment that did not comply with Local Rule 7056-1. *See In re Roman*, 283 B.R. 1, 11 (9th Cir. BAP 2002) (noting that courts have applied the standard of § 330 for compensating professionals in bankruptcy, which provides for "reasonable compensation for actual, necessary services.")

3. Punitive damages

In order for punitive damages to be awarded, the creditor must have acted with actual knowledge that it was violating a federally protected right or with reckless disregard of whether it was doing so. *In re McCarthy*, 421 B.R. 550, 568 (Bankr. D. Colo. 2009). The primary purposes of an award of punitive damages are punishment and deterrence. *Id.* The five primary factors to be considered in determining whether to award punitive damages include: the nature of the creditor's conduct; the creditor's ability to pay damages; the level of sophistication of the creditor; the creditor's motives; and any provocation by the debtor. *Id.*

The Court finds that Den-Cut acted with actual knowledge that it was violating a federally protected right or with reckless disregard of whether it was doing so. At trial, Rudibaugh continued to assert that he relied on his attorney, Mr. Bowes, who erroneously told him the stay did not apply because only Stellato, and not the Company, had filed for bankruptcy.

---

[9] At trial, counsel for Den-Cut asked for the admission of a settlement offer in order to show that Den-Cut did take measures to remedy the situation. Counsel for Stellato objected under Fed. R. Evid. 408. The Court allowed Rudibaugh to testify that he had offered a settlement after new counsel came into the case in September 2013, but not about the specific terms of the offer. Nevertheless, the Court discounts this as evidence of an actual attempt to rectify the damage, as it came over a year after the stay violation occurred and litigation had proceeded.

However, "the determination of whether the automatic stay applies to any given activity or property is to be made in the first instance by the bankruptcy court, not by a creditor or its attorney." *Gagliardi* at 814. "A creditor and its agents act at their own peril when they usurp the bankruptcy court's role in determining the scope of the automatic stay, without binding authority that is clearly applicable to the facts at hand. Filing a stay relief motion is an inexpensive form of insurance against a stay violation award." *Id.* at 818. Punitive damages may be awarded for the willful violation of the automatic stay even where the creditor believed in good faith that it had a right to the property. *In re Distad*, 392 B.R. 482, 488 (Bankr. D. Utah 2008) (citing *In re Diviney*, 225 B.R. 762 (10th Cir. BAP 1998).[10]

      a. Nature of creditor's conduct

This willful violation of the automatic stay was not a technical violation, like sending a letter or making a phone call. *See, e.g., McCarthy*, 421 B.R. at 550. This violation caused damage to Debtor's premises. Rudibaugh testified that he did not intentionally disregard or ignore the law, but this was contradicted by Mr. Neumann's testimony that, knowing of the bankruptcy filing, Rudibaugh stated he wanted his equipment and "F*** the stay." The Court found Neumann's testimony to be credible, and Rudibaugh's testimony that he "does not recall" such a conversation to be not credible. Den-Cut clearly put its economic objectives ahead of the Debtor's rights under the Bankruptcy Code when it usurped this Court's role in determining whether the stay applied.

      b. Creditor's ability to pay damages

At trial, Rudibaugh testifed that Den-Cut had yearly gross revenue of $650,000 in 2012. He also agreed that Den-Cut's related entity, Denver Cutlery, grossed substantially more ($3 million). While there was testimony that these entities maintained separate books, records, bank accounts, and tax identification numbers, it was undisputed that Den-Cut was formed to finance equipment sold by Denver Cutlery. Rudibaugh is the General Manager of Denver Cutlery and the Manager of Den-Cut. The Court finds that Den-Cut has the ability to pay damages.

      c. Level of sophistication of the creditor

Rudibaugh testified that, while his company had experience with repossessions, it was unfamiliar with bankruptcy. Rudibaugh also testified that his long-time counsel, Mr. Bowes, also was unfamiliar with bankruptcy. However, the Court finds that a business that is involved with repossessions should be familiar enough with bankruptcy to know it should seek this Court's assistance to obtain relief from the automatic stay, especially when served with multiple notices of the bankruptcy filing.

---

[10] The exception in §362(k)(2), relating to a Chapter 7 debtor's duty to file a statement of intention under § 521(a)(2), does not apply in this Chapter 13 case.

d. Creditor's motives

While Rudibaugh testified that he had no ill will toward Stellato or his business, his conduct reflected an agenda to acquire possession of the equipment expeditiously regardless of the consequences. As counsel for Stellato pointed out in closing argument, "why the rush?" Why not seek the assistance of this Court, or even the State Court, to determine how to proceed? Large kitchen appliances are not likely to disappear overnight.

e. Provocation by the debtor

Den-Cut argued that Stellato could have prevented the damage by immediately informing the Deputy of the bankruptcy, rather than locking the door and fleeing. Stellato testified credibly that he did not connect the Deputy's arrival with the repossession efforts, and this is corroborated by the Deputy's testimony that, as he arrived, he saw someone flee out the back door of the premises, but he was not sure if it was Stellato. Further, Stellato was under no obligation to inform the ten Den-Cut representatives of the bankruptcy when he knew his counsel had already informed Den-Cut of the bankruptcy. Unfortunately, Den-Cut chose to disregard that information.

Thus, the Court finds the relevant factors weigh in favor of awarding punitive damages. The amount of punitive damages should be sufficient to deter Den-Cut, and similarly situated parties in the future, from unilaterally determining the scope and effect of the automatic stay. *Gazzo*, 505 B.R. at 46. The amount of damages awarded depends on the facts and circumstances of the case. *See Diviney*, 225 B.R. at 777 (affirming a punitive damages award of $40,000 in a case where actual damages were $2,850 plus $15,000 in attorney fees); *In re Scroggin*, 364 B.R. 772 (10th Cir. BAP 2007)(affirming $5,000 in punitive damages where actual damages were $2,000); *In re Sumpter*, 171 B.R. 835, 845 (Bankr.N.D.Ill.1994) (awarding punitive damages equal to compensatory damages, noting that the creditor was probably facing financial problems of its own); *In re Shade*, 261 B.R. 213, 216 (Bankr. C.D. Ill. 2001) (awarding punitive damages of $9,000 in a case involving $1,000 in compensatory damages).[11]

In *Diviney*, the Tenth Circuit Bankruptcy Appellate Panel held that the cost of litigation to vindicate rights may be considered when determining the size of the punitive damages award. The Court has not yet determined the amount of reasonable costs and attorney fees to be awarded in this case. Nevertheless, the Court recognizes from its experience that those fees and costs are likely to equal or exceed the amount of actual damages for food spoilage and damage to the door and drive-through. *See In re Culley*, 347 B.R. 115 (10th Cir. BAP 2006) (affirming punitive damages of $10,000 where actual damages were only $658 but attorney fees and costs were almost $20,000).

---

[11] The *Shade* court noted that, in its review of similar cases, "punitive damages range from $100 to $100,000." *Id.* at 217 (collecting cases).

"The automatic stay is among the most basic of debtor protections under bankruptcy law. In order to secure these important protections, courts must display a certain rigor in reacting to violations of the automatic stay." *In re Soares*, 107 F.3d 969, 975 (1st Cir. 1997). "The primary purpose of punitive damages awarded for a willful violation of the automatic stay is to cause a change in the creditor's behavior; the prospect of such change is relevant to the amount of punitive damages to be awarded." *In re Shade*, 261 B.R. at 216. An award of punitive damages should be "gauged by the gravity of the offense, and set at a level sufficient to insure that it will punish and deter." *In re Ocasio*, 272 B.R. 815, 825(1st Cir. BAP 2002) (citing *In re Novak*, 223 B.R. 363 (Bankr.M.D.Fla.1997)).

In this case, the Court finds that Stellato is entitled to punitive damages in the amount of $25,000. This is an amount roughly equal to twice the amount of actual damages incurred, not including attorney fees and costs still to be determined. Such an amount is also necessary due to the gravity of the offense involved and the necessity of preventing such an occurrence, either by Den-Cut or other creditors, in the future. Den-Cut's actions were a serious threat to the Debtors' ability to reorganize their financial affairs under Chapter 13 and to the estate's ability to pay other creditors.

Accordingly, it is

HEREBY ORDERED that Stellato's Complaint for Violation of Automatic Stay is GRANTED. Den-Cut is ordered to pay $11,271.90 in actual damages, plus $25,000 in punitive damages, to Stellato. On or before May 23, 2014, Stellato shall submit a bill of costs and attorney fees to this Court, and Den-Cut shall have 14 days to file an objection. Upon a determination of reasonable costs and attorney fees, the Court shall issue a separate order awarding payment to Stellato by Den-Cut.

Dated this 9th day of May, 2014.

BY THE COURT:

_____
Howard R. Tallman, Chief Judge
United States Bankruptcy Court